## Pennsylvania Company for Insurances on Lives and Granting Annuities, to use, Appellant, *v.* Broad Street Hospital.

124

Argued April 10, 1946. Before MAXEY, C. J., DREW, LINN, STERN, PATTERSON, STEARNE and JONES, JJ.

*J. Warren Brock*, with him *George B. Clothier, Leon J. Obermayer* and *Edmonds, Obermayer and Rebmann*, for appellant.

*Jacob S. Richman*, with him *Vito F. Canuso, Philip Richman*, and *Richman & Richman*, for appellee.

OPINION BY MR. JUSTICE LINN, May 27, 1946:

The point for decision is whether a mortgagor's right of redemption must be exercised before the sheriff's hammer falls, or whether the right may be exercised after

such sale but before acknowledgment and delivery of the sheriff's deed following the sale. The point has not heretofore been expressly passed on by this court. The court below held that the right to redeem could be exercised after the sale but before the acknowledgment and delivery of the sheriff's deed. The correct decision is of considerable importance in the conduct of such sales and the effect to be given to them. It happens that the Court of Common Pleas of Berks County recently reached the opposite conclusion: *Federal Farm Mortgage Corporation v. Howard,* 47 D. & C. 64, and denied redemption after the property had been knocked down to the sheriff's vendee. It is elementary that "all judicial sales must be open to free and fair competition" (*Slingluff v. Eckel,* 24 Pa. 472, 474) and that courts will reject any procedure easily adapted to frustrate free and fair judicial sales.

The defendant, Broad Street Hospital, made two mortgages to the Pennsylvania Company for Insurances on Lives and Granting Annuities, the first one dated May 2, 1927, and the second one, dated January 10, 1938, and defaulted on both. On November 5, 1945, judgment for $73,946.67 [1] was entered on the bond accompanying the second mortgage. On November 8, 1945, Pennsylvania Company issued a writ of fieri facias, returnable on the first Monday of December, 1945. On November 27, 1945, after the writ was issued but before the return day, the suit was marked to the use of the appellant, The Jefferson Medical College of Philadelphia. On December 3, 1945, at the sheriff's sale on the fi. fa., the mortgaged property was sold to the appellant for $124,500. On December 11, 1945, on defendant's motion, the court granted a rule to show cause why the sheriff's sale to appellant should not be set aside on the ground that after

---

[1] On the bond accompanying the first mortgage, judgment for $100,177.15 was entered on December 7, 1945, in favor of the use-plaintiff. The total of both judgments against defendant was $174,123.82.

the sale, defendant had tendered the amount of the judgment with interest and costs. Appellant answered responsively but the court made the rule absolute.[2] This appeal then followed.

The reason given by the learned court for setting aside the sale was that the "owner of mortgaged real estate has the right to redeem it until the acknowledgment and delivery of the Sheriff's deed, and that he is not finally foreclosed by the Sheriff's hammer alone." The court stated that there were no "equities" "sufficient to warrant setting aside the Sheriff's sale," no gross inadequacy of price, "no misleading or fraud, and there are no technical defects."

The fact, then, is that the record disclosed no defect that would justify the order appealed from. If there is no defect in the record, we must sustain the appeal and reverse the order unless the right to redeem remained after the sale of defendant's equity.

The appellant contends that the mortgagor's right to redeem ended when the property was knocked down to appellant; that the only right then left in the mortgagor was to have possession during the period between the sale and the delivery of the deed: compare *Hardenburg v. Beecher*, 104 Pa. 20.

The mortgagor's equity of redemption is the title remaining in him subject to the mortgage, and the right of redemption is the right to require the holder of the mortgage to receive payment of the matured debt and to satisfy the lien. We have no statutes regulating the exercise of this right of redemption. No statute author-

---

[2] The order provided: "AND Now, this 8th day of January, 1946, the defendant's rule to set aside the Sheriff's sale is made absolute; the use-plaintiff is directed to accept the defendant's tender of the debt, interest, and costs; and the Sheriff is directed to return to the use-plaintiff the amount of its deposit money, on which the defendant shall pay to the use-plaintiff interest at the rate of six per cent. From the date of deposit, together with such costs as the use-plaintiff has incurred in these proceedings." The court below granted a supersedeas.

izes redemption after the sale. The court was therefore without power to make the order allowing redemption after the sale. In *Parker v. Dacres,* 130 U. S. 43, HARLAN, J., said, at p. 47, "In the view we take of this case it is unnecessary to express an opinion whether the provision relating to sales under execution, properly interpreted, gave a right of redemption after sale under a decree of foreclosure. If it did not, the decree below must be affirmed, for a right to redeem, after sale, does not exist unless given by statute. Counsel for the plaintiff speaks of a common-law right of redemption after sale that attaches in the absence of any statutory provision on the subject. We are not aware of any such right existing at common law, or in the system of equity as administered in the courts of England previous to the organization of our government . . ."

Our statutes authorize the taking of land in execution and provide that the purchaser at sheriff's sale shall take the land (as provided in the Act of 1705, 1 Sm. L. 57, section 6, 21 P.S. 791) "for such estate or estates as they were sold or delivered, clearly discharged and freed from all equity and benefit of redemption . . ." or (as provided in section 66, Act of June 16, 1836, P. L. 755, 12 P. S. 2447) the land "shall be quietly and peaceably held and enjoyed by the person to whom the same shall be sold or delivered, and by the heirs, successors or assigns of such persons, as fully and amply, and for such estate and estates . . . as he or they for whose debt or duty the same shall be sold or delivered might, could, or ought to do at or before the taking thereof in execution."

The sheriff's sale was conducted in the usual way. The accepted view of a sale by auction is stated by Williston, Contracts, sec. 29, vol. 1, p. 68. "The auctioneer may more accurately be said to invite offers than himself to be an offeror, and the law has adopted this doctrine. Since the bargain is incomplete until the hammer falls, a bidder may therefore retract his bid until that time. The same point is involved in decisions turning on

the right of the auctioneer to withdraw an article offered for sale; and for the same reason, until the hammer falls, the auctioneer may withdraw, unless it has been advertised or announced that the sale shall be without reserve . . ." See Restatement, Contracts, section 27, vol. 1; *Stover v. Rice*, 3 Whart. 21; *Fisher v. Seltzer*, 23 Pa. 308; *Stroup v. Raymond*, 183 Pa. 279, 38 A. 626; *Acker v. Snyder*, 250 Pa. 57, 95 A. 325. When the sheriff accepted the bid, the purchaser acquired a right to a deed on complying with the terms of sale and assumed the obligation of complying with those terms: *Dickson v. McCartney*, 226 Pa. 552, 75 A. 735. The appellant purchaser's position was, in substance, that of a purchaser by articles of agreement; the purchaser had acquired an equitable interest which would become a complete title on complying with the terms of the sale: compare *Stover v. Rice*, 3 Whart. 21; *Slater's Appeal*, 28 Pa. 169.

For many years it has been the general understanding in this Commonwealth that the sheriff's sale takes place when the hammer falls. Recently in *St. Louis B. & L. Ass'n v. Hamilton*, 319 Pa. 220, 179 A. 604 (1935), in considering the time when a sale takes place, Mr. Justice SCHAFFER said: "Certainly in common parlance the word 'sale' when used in connection with a sheriff's vendue means the time when he knocked down the property to the bidding purchaser."

As the learned court below declined to rule that the sale took place when the hammer fell (and, in view of the opposite conclusion reached by the Court of Common Pleas of Berks County, referred to above) we may consider the cases at some length.

*Young's Appeal*, 2 P. & W. 380 (1831) appears to be the earliest reported case in which this court considered the subject. Property had been knocked down to Young but before a deed was delivered the court set aside the sale on the sole ground that the debtor had tendered payment after the sale but before delivery of a deed. Young appealed. In support of its ruling, the court be-

low said : "The purchaser undoubtedly has his rights. The sale, in this case, was fairly made; but on the return-day . . . and before the deed is acknowledged, the debtor comes into court, offers to pay the debt, and asks to retain his lands. The creditors do not object; the purchaser alone says he has acquired a right to the land. There does not appear to be any peculiar hardship in the case of the purchaser who pays his money and is disappointed in getting his deed, by reason of the sale being set aside by the court. The sale is not complete until the deed is acknowledged in court. Until the acknowledgment of the deed the debtor is not divested of his estate, and it seems to me that if the debtor pays the debt before the purchaser has acquired a legal right to the land, the equity of the debtor to retain is stronger than that of the purchaser, who insists upon the forfeiture." On appeal, this was disapproved. Ross, J., in specifying the error of the court below, stated : "The opinion delivered by the court below is predicated upon false principles and arrives at erroneous conclusions. It is not supported by law, equity or expediency. The *bona fide* purchaser, at a public sale of land, the moment it is knocked off to him, if he complies in all respects with the conditions of sale, instantly acquires a vested right to the property sold. Such a purchaser would be bound by his bargain thus made, although his bid greatly exceeded its value. And if he purchase at a *bona fide* sale, greatly below the value, the vendor would be bound by the sale. *Equality* in this case at least is *equity*. The vendee certainly should have the advantage of a purchase at a price below the value, when he is bound by a purchase at a price greatly exceeding the true value: . . . In order to set aside a sheriff's sale, there must be satisfactory evidence of fraud or abuse of power in the sheriff: . . . These general observations are made with the hope that any practice in opposition to these principles, which may have arisen in some of the courts, as to sheriffs' sales, may be corrected. It is not a sound exercise of the discretionary power of a

court to destroy the vested rights of a fair purchaser, either from feelings of sympathy for the defendant in the execution, or because the court may not see any peculiar hardship in the *bona fide* purchaser being arbitrarily deprived of his just and equitable right. The practice, if any such exist, as well as the principle laid down in the opinion of the court below, are highly inexpedient; and if there were no other reason, this alone should be sufficient to prevent such a practice being recognized as law. It is indeed calculated to affect sheriffs' sales very injuriously. Who would become bidders on such terms? Who would purchase and pay his money at sheriff's sale, if the defendant in the execution could at any time before the acknowledgement of the deed upon payment of the debt retain the property and rescind the sale? The purchaser, under such circumstances, would not only lose the opportunity of purchasing other property but in some cases would be compelled to pay interest on money borrowed, for the purpose of paying for the property purchased at sheriff's sale. The practice would indeed be pregnant with ruin and injustice. Is there any cause either in law or equity, in which any court has thought proper to rescind a contract, on the application of the party in default? Or, can any case be produced (except the decision in question) where a bargain made in good faith has been rescinded against the will and consent of the party who has performed everything required of him, and who insists on a specific execution of the terms on which he bought? Individually I do not entertain a doubt that the practice authorized by the opinion of the court below, cannot be supported upon any principle, either of law, equity or expediency. Although this point has not been argued, I have nevertheless felt myself bound to express a decided opinion on the subject, before I proceeded to consider the motion to dismiss the appeal." Chief Justice GIBSON concurred. The other three justices declined to express an opinion because the point had not been argued. While

the opinion expressed was not necessary to the dismissal of the appeal, it was not a chance expression of view but one deliberately made for the guidance of future sheriffs' sales.

Between the date of *Young's Appeal* (1831) and the decision in *B. & L. Ass'n v. Hamilton,* in 319 Pa. 220, 179 A. 604 (1935), the rule has been frequently repeated with approval. In *Stewart v. Freeman,* 22 Pa. 120, 123, LEWIS, J., said: "The rule of *caveat emptor* applies with such strictness to a purchaser at sheriff's sale, that he is bound to pay the purchase-money although he may discover that the title is altogether worthless. . . . The time when the sale is made, not the date of the sheriff's deed, nor of its acknowledgment, is the period at which the state of the possession and of the records becomes material . . . Hence it follows that although his title is not perfect before the acknowledgment of the sheriff's deed, so as to enable him to obtain possession, it is sufficiently so to vest in him an interest in the land and to bind him for the money. It is therefore sufficient to protect him in the payment of it." In *Slater's Appeal,* 28 Pa. 169, it was said that the purchaser at a sheriff's sale has "an inceptive interest in the soil, which may be bound by a judgment, and which, when perfected by payment and a conveyance, gives the encumbrancer, by relation, the benefit of his security to the extent of the whole estate: . . ."

*Hoyt v. Koons,* 19 Pa. 277, 279, was trespass for cutting timber, both parties claiming the land under sheriffs' sales under different judgments. BLACK, C. J., said, "The plaintiff below bought the land in dispute at sheriff's sale in November, 1842; the deed was acknowledged on the 23d of January, 1844. After the sale to the plaintiff the same land was again sold as the property of the same person, but under another execution and judgment. At this second sale one of the defendants was the purchaser, and had his deed acknowledged on the 11th January, 1843. The only question which the record presents

is, whether a title acquired by a sheriff's sale can be defeated by a subsequent sale to another person, when the deed to the last purchaser is *first* acknowledged. We answer it here, as it was answered by the Common Pleas, in the negative. The sale divests the title of the defendant in the execution, and the judgment creditors must either set it aside, or look to the fund for payment of their liens." In *Gibson v. Winslow,* 38 Pa. 49, 54, an action of ejectment, Thompson, J., said, "The moment the land was struck down, the interest of the purchaser attached. The deed is but the legal evidence of the sale, and relates back to the moment it was made ... ." In *Penna. S. V. R. Co. v. Cleary,* 125 Pa. 442, 451, it was held that a purchaser at a sheriff's sale acquired an inchoate title by his accepted bid entitling him to institute condemnation proceedings against a railroad company entering after the sale but before the delivery of the sheriff's deed. Williams, J., said: "It is well settled however that a purchaser at sheriff's sale acquires an inchoate title in the land purchased by virtue of his bid, and its acceptance by the sheriff. The subsequent acknowledgment and delivery of the deed provides the purchaser with the evidence of his title which relates to, and takes effect as of the date of the sale recited in it. The title of M. J. Cleary to this land vested at the time of his purchase from the sheriff on the 11th of July, 1885, notwithstanding the fact that he was not provided with the legal evidence of his title until 1888."

In *Stroup v. Raymond,* 183 Pa. 279, 282, a sheriff's sale was set aside on the joint request of the debtor, the creditor and an intending bidder on their averment that the sale took place under a mutual mistake concerning an incumbrance. In holding that to be sufficient ground for setting aside the sale, Dean, J., referred to *Young's Appeal* and said: "All the judges concurred in dismissing Young's Appeal, because no appeal was given by the act of 1827; two of the judges, Ross and Gibson, C. J., wholly dissented from the reasons given by the court

below for setting aside the sale; the other three judges declined to express an opinion, as to this part of the case, because it had not been argued. But the opinion of ROSS, J., concurred in by GIBSON, C. J., *has ever since been followed by this court, as the law,*[3] . . . The opinion there states: 'The bona fide purchaser at a sheriff's sale of land, *the moment it is knocked off to him,* if he complies in all respects with the conditions of sale, *instantly acquires a vested right to the property sold.*[4] Such a purchaser would be bound by his bargain thus made, although his bid greatly exceeded its value. And if he purchase at a bona fide sale, greatly below the value, the vendor would be bound by the sale. Equality, in this case at least, is equity.' The opinion then goes on to show that any other rule would necessarily affect sheriff's sales very injuriously, because buyers would not attempt to purchase at such sales, when they could be set aside for mere inadequacy of price. We do not see that lapse of time has changed the rule that 'equality is equity' into the opposite one that inequality is equity. The same reasons for adhering to all other formal solemn contracts exist where sheriffs' contracts are regular and made under no misapprehension as to material facts. We are clearly of the opinion that the rule was founded upon the soundest reason, and should be adhered to." If this court had then been of opinion that a sheriff's sale did not foreclose the equity, but that acknowledgment and delivery of a deed were required, it would have been unnecessary to proceed further with the suit; it would only have been necessary for the debtor, the creditor and the intending bidder (as they were the petitioners) to get together, hand the necessary amount to the creditor and so end the proceeding and thereby deprive the purchaser of his purchase.

As the opinion in that case was written by Justice DEAN, and as he declared that the rule of *Young's Ap-*

---

[3] Italics supplied.
[4] Italics supplied.

*peal* "has ever since been followed by this court as the law,"[5] we may at this point refer to an earlier case, relied on by the defendant, in which Justice DEAN also wrote the opinion: *Collins v. London Assurance Corp.*, 165 Pa. 298, 30 A. 924. It appeared in that case that the plaintiff, owner of mortgaged premises, had them insured by the defendant; after foreclosure sale but before delivery of the sheriff's deed, fire destroyed the premises. The plaintiff sued for the insurance; the trial turned on whether the policy had become void by the clause "any change . . . in the interest, title or *possession* of the subject of the insurance." The case involved no controversy between the mortgagor and the mortgagee or the purchaser at the sale. The decisive fact was that the mortgagor was still lawfully in *possession;* she could not have been ejected until after the delivery of the sheriff's deed. By its express words, the policy covered as long as she had possession. The principle applied in deciding the case was that the party in possession at the time of the fire had an insurable interest. Obviously, that decision is not inconsistent with what we are now deciding. Nor is the obiter dictum on page 312 of *Derr v. New York Joint Stock Land Bank,* 335 Pa. 309, 6 A. 2d 899, controlling.

The record shows that the appellant acquired the same rights that any other bona fide purchaser at the sheriff's sale would have acquired. In measuring the extent of those rights, it is of no consequence that after the fi. fa. was placed in the hands of the sheriff by the mortgagee, the proceeding was marked to appellant's use. There is evidence that during the period when the mortgages were in default, the Pennsylvania Company, mortgagee, sought[6] a purchaser for the property "con-

---

[5] This refers as much to the effect of the fall of the hammer as to the element of consideration.

[6] Mr. Ringe, a real estate broker, testified that, on behalf of the Pennsylvania Company, he sought a purchaser of the property and brought the subject to the attention of Jefferson Medical College:

ditioned upon our [the Pennsylvania Company] obtaining title." The Pennsylvania Company agreed on September 25, 1945, to sell to the appellant if, as Mr. Sayre testified, his Company obtained title by foreclosure. Instead of carrying out that plan, which was begun by the issuance of the fi. fa., they consummated their arrangement by marking the execution to the purchaser's use. The purchaser's position as a sheriff's vendee is therefore no different from what it would have been if appellant had purchased at the execution without taking an assignment of the judgment. The bidding was actively competitive, the competing bidder being Mr. Lieberman. Mr. Jacoby, vice president of defendant's Board of Trustees, testified that defendant had not authorized anyone to bid on its behalf. The competitive bidding was recognized by the court below in saying, "When Mr. Lieberman bid at the sale, he had no authority from the defendant's Board of Directors: he was bidding on authority from Dr. Wolffe and the staff of defendant's doctors." Dr. Wolffe was not a member of defendant's staff; the court added that after the sale, the Board of Directors "ratified the arrangement suggested by Dr. Wolffe, . . ." [1]

To adopt the view of the learned court below would establish a rule militating against sheriffs' sales by keeping away competitive bidders; they would be deterred

---

"A. I submitted it to a religious order from Reading, I submitted it to the veterans' group, U. S. Navy, the public health service, and to the Osteopathic Hospital. Q. For one reason or another, all of those negotiations fell through? A. That's right. Q. And after they had failed, you then submitted the proposition to Jefferson? A. Yes, sir. Q. Jefferson did not ask you to submit the proposition or did not take the initiative? A. No. Q. You approached Jefferson? A. I approached Mr. Hooper; I had never known him before, but I thought he could use it. Q. When was that? A. In January 1945. Q. What happened? A. After I approached Mr. Hooper he asked me to send him full details. I contacted Mr. Sayre and Mr. Breen, and told them what I had done. They said, 'Supply Jefferson with full details.' Q. And then Jefferson made an offer pursuant to your conferences with representatives of Jefferson? A. Yes, sir."

by the ease with which an unsuccessful bidder could take the property away from the successful bidder by collusive arrangements with the debtor, made between the time of the sale and the delivery of the sheriff's deed. We think the rule to be adopted should outlaw the possibility of such fraud. Apparently, in this case, the mortgages were long in default; the mortgagor could not pay; the Pennsylvania Company was willing to take less than its debt; its broker interested the appellant as a purchaser. It was only after the property was about to be sold by the sheriff that the arrangement for raising money referred to in the opinion of the court below, was made. We have no doubt that this arrangement was made in good faith by Mr. Lieberman and the physicians who authorized him to bid, but the fact that such an arrangement was possible indicates how easily parties fraudulently inclined might take from a successful bidder the property purchased. The tender made at bar in the court below was, as the court said, of ". . . money coming from another medical group headed by Dr. Wolffe that is interested in making some use of defendant hospital." Defendant was not tendering its own money. In effect, a new purchaser was being substituted for the sheriff's vendee. It also illustrates the value of the warning made in *Young's Appeal* against the adoption of rules conducive to wrongful [7] interference with sheriffs' sales. If asked what harm there is in allowing full payment to this creditor, the answer is that the court

[7] President Judge SCHAEFFER expressed this very well in *Federal Farm Mortgage Corp. v. Howard*, 47 D. & C. 64, at page 70. "Judge Ross, in Young's Appeal, supra, stated that the practice of permitting the execution defendant to pay the debt after the sale and before the acknowledgment and thus to rescind the sale would be 'calculated to affect sheriffs' sales very injuriously.' It would tend to discourage the attendance of bidders at the sale. And it would open the door to the evil practice of permitting disappointed bidders to enter into a collusive agreement with the defendant in the execution by which such bidder could after the sale offer the defendant a sum greater than the highest price bid and thus obtain the property. It would destroy the finality of sheriffs' sales."

should adopt the rule most likely to keep all sheriffs' sales "open to free and fair competition"; fraudulent collusion should not be made easy.

It is a fact, in some cases, resulting from the provisions of statutes, in others, from established rules of the common law, and in others, depending on contracts (*Collins v. London Assurance Corp.,* supra, is an example) that both the mortgagor, whose equity has been sold, and the purchaser, who bought it, have rights and obligations between the date of sale and the acknowledgment and delivery of the deed; these cases do not now require discussion.

We should perhaps add that we have examined the references made in the briefs to decisions and statutes of other states but found they afforded little or no aid in our review of the record before us because of differences in the law in other states. Nor shall we refer to general statements quoted from text books, beyond saying that Vol. 1, Glenn on Mortgages, sec. 100, p. 620; Vol. 3, Wiltsie on Mortgage Foreclosure, sec. 1203, p. 1813; Vol. 36, Am. Jur. sec. 183, p. 784; see also, 35 C. J. Sec. 103, p. 67, cited by appellant, contain statements supporting the rule we have adopted.

Order reversed; record remitted with instructions to discharge the rule; costs to be paid by appellee.

---

Mr. Justice HORACE STERN and Mr. Justice JONES are of opinion that since there is no prior appellate court decision in Pennsylvania on the question here involved, which is therefore one of first impression, the better rule, in cases where the creditor himself becomes the purchaser of a property sold at sheriff's sale on the creditor's execution, would be to require the sheriff to accept payment of the debt, interest and costs in satisfaction of the writ if tendered to him at any time prior to his acknowledgment of a deed for the property.