836 F.2d 808
 61 A.F.T.R.2d 88-370, 56 USLW 2386, 88-1
USTC P 9178
 UNITED STATES of America
v.
Frank M. CAPOBIANCO, Mary Capobianco, Eleanor Capobianco,
Nancy Forte for First National Bank of Bangor, Now First
Valley Bank; Raymond E. Prinz; First National Bank of
Allentown, Edward Peel Binder; Schnader, Harrison, Segal &
Lewis; Harold E. Gruger, Anthony Capobianco, Michael J. Capobianco.
Appeal of Michael J. CAPOBIANCO.
 No. 87-1126.
 United States Court of Appeals,
Third Circuit.
 Argued Oct. 5, 1987.
Decided Jan. 4, 1988.
As Amended Jan. 15, 1988.
Rehearing Denied Feb. 1, 1988.
 
 Peter S. Steinberger (argued), Stuart T. Shmookler, Allentown, Pa., for appellant.
 Gary D. Gray (argued), Michael C. Durney, Acting Asst. Atty. Gen., Tax Div., Michael L. Paup, William S. Estabrook, Tax Division Dept. of Justice, Washington, D.C. (Edward S.G. Dennis, Jr., U.S. Atty., of counsel), for appellee.
 Before WEIS and STAPLETON, Circuit Judges, and COHILL,* District Judge.
 OPINION OF THE COURT
 WEIS, Circuit Judge.
 
 
 1
 The first question presented on this appeal is whether a sheriff's sale of real property on foreclosure of a purchase money mortgage extinguished subsequent federal tax liens. We conclude that the state's proceeding qualified as a "judicial sale" under federal divestment statutes and the district court erred in ruling to the contrary. The second issue is whether a record title holder received the property as a gift from the purchaser at the sheriff's sale. On that point we decide that a remand for further factual development is necessary.
 
 
 2
 In this suit to enforce tax liens, the district court entered summary judgment for the United States, finding that Michael Capobianco was not the owner of certain property and that an earlier sheriff's sale had not extinguished the government's liens, 652 F.Supp. 325.
 
 
 3
 The sheriff's sale concluded the mortgage foreclosure of realty located on Madison Street in Allentown, Pennsylvania.[1] In 1964, Frank Capobianco acquired the property subject to a purchase money mortgage. Over an eleven year period spanning 1968 through 1979, the Internal Revenue Service had filed tax liens totalling $181,994 against the property.
 
 
 4
 In 1976 Frank's brother, Onofrio Capobianco, purchased the mortgage from the mortgagor bank for consideration. In May 1977 Onofrio brought an action for foreclosure in the Court of Common Pleas of Lehigh County, Pennsylvania. In view of the federal tax liens, the foreclosure complaint named the United States a party defendant as provided in 28 U.S.C. Sec. 2410. In its answer, the government stated that it would interpose no objection to the foreclosure proceedings so long as they resulted in a "judicial sale" within the meaning of section 2410. Judgment in favor of Onofrio on the mortgage foreclosure was duly entered on August 1, 1977. He secured a writ of execution the next day, but did not act on it.
 
 
 5
 Four years later Onofrio secured a second writ of execution, and a sheriff's sale was scheduled for May 22, 1981. The Lehigh County Sheriff mailed notice of the impending sale to the United States Attorney for the Eastern District of Pennsylvania and to the Attorney General in Washington, D.C. Receipts for these notices were signed on May 4, and May 5, 1981 respectively.
 
 
 6
 The sheriff's sale was held as scheduled. At Onofrio's direction, attorney Robert McFadden purchased the property from the sheriff for $25,000. This sum slightly exceeded the amount of the foreclosure judgment, unpaid priority property taxes, and sheriff's fees. The sheriff dutifully mailed to all lien holders copies of the schedule of distribution which the Internal Revenue Service received on July 27, and July 28, 1981.
 
 
 7
 Raymond Prinz, a junior lien holder, filed exceptions to the distribution schedule in August 1981, objecting to payment of some of the taxes in advance of his lien. The United States did not file objections. The matter remained in suspense for more than a year until September 10, 1982, when a Court of Common Pleas judge dismissed the Prinz exceptions.
 
 
 8
 All challenges to the sale resolved, the sheriff contacted attorney McFadden for instructions on drawing the deed to the property. At Onofrio's direction, the attorney told the sheriff to deed the property to a nephew, Michael Capobianco (Frank's son), as the grantee. The sheriff signed the deed dated September 22, 1982, listing Michael J. Capobianco as grantee and reciting a consideration of $25,000.[2] The deed was recorded that same day in the Office of the Recorder of Deeds of Lehigh County,[3] and in due course was mailed to McFadden's office, where his secretary filed it without informing him of its arrival. Three months later, Onofrio died having given McFadden no further instructions.
 
 
 9
 In July 1984 the United States began its own foreclosure action against the property to satisfy its liens. The government filed a motion for summary judgment, which the district court granted as unopposed. However, on later learning that his uncle had named him grantee of the property, Michael Capobianco moved to intervene in the government's suit. The district judge denied intervention and Michael appealed to this court. Before the appeal could be resolved, the government and Michael agreed to a remand to the district court so that he could intervene to establish his interest in the property.
 
 
 10
 Back in the district court, the government moved for summary judgment against Michael. The judge ruled that Onofrio had neither actually nor constructively delivered the sheriff's deed to Michael as required under Pennsylvania law to perfect a gift of realty. Thus, the court concluded that Michael did not hold title to the property. The court further determined that the May 22, 1981 sheriff's sale was not a "judicial sale" within the meaning of 28 U.S.C. Sec. 2410(c), and thus it did not discharge the tax liens.
 
 
 11
 The court acknowledged that 26 U.S.C. Sec. 7425 offered an alternative for selling the property free of the tax liens, but observed that section 7425 required notice to the Secretary of the Treasury not less than twenty-five days before the sale. That condition, however, had not been satisfied. Accordingly, the court entered summary judgment for the government.
 
 
 12
 On appeal, Michael contends that under Pennsylvania law the formal requirement of delivery of a sheriff's deed is met when the sheriff presents the document to the Recorder of Deeds and it is recorded. Because that occurred here, Michael asserts that title to the property passed to him. Michael also argues that a Pennsylvania sheriff's sale in a mortgage foreclosure proceeding is a judicial sale which extinguishes the government's junior tax liens by operation of section 2410. The government contests both contentions.
 
 I.
 A.
 
 13
 In ruling that Michael had not established his title by gift from Onofrio, the district court cited Fiore v. Fiore, 405 Pa. 303, 174 A.2d 858 (1961). In that case, the Pennsylvania Supreme Court held that to establish an inter vivos gift of realty the donee must show (1) a donative intent on the part of the grantor at the time the deed was executed, and (2) an actual or constructive delivery of the deed to the grantee, "which divested the donor of all dominion over the property and invested the donee therewith." Id. at 305-06, 174 A.2d at 859.
 
 
 14
 In discussing the requirements of a gift, Fiore explained that a constructive delivery can pass title. But if the deed is placed in the possession of a third party, to transfer title "there must be an express and definite instruction that the deed is to be given to the grantee then or at some future time." Id. at 306, 174 A.2d at 860 (emphasis omitted). A constructive delivery can be accomplished in this manner even if the deed is given to a third party without the donee's knowledge. Loutzenhiser v. Doddo, 436 Pa. 512, 517, 260 A.2d 745, 747 (1970).
 
 
 15
 The Fiore line of cases, on which the district court relied, sets forth the legal prerequisites only for private inter vivos transfers. These cases do not address the conditions for transfers by a sheriff in the exercise of his legal authority. This distinction is significant.
 
 
 16
 The deed in this case was prepared by the sheriff, not by the donor. The property was acquired through a public, involuntary transfer implemented by the sheriff as an agent of the court, and carried out to satisfy valid liens on the property. As such, a conveyance through a sheriff's sale bears little resemblance to an ordinary, voluntary transfer of title between a private grantor and grantee.
 
 
 17
 Delivery of a sheriff's deed and its effect are governed by Pennsylvania procedural rules as well as statutory and common law. Pennsylvania Rule of Civil Procedure 3135 provides that:
 
 
 18
 "When the sheriff sells real property in execution, he shall, at the expiration of ten (10) days after the filing of the schedule of distribution, if no petition has been filed to set aside the sale, execute and acknowledge before the prothonotary a deed to the property sold. The sheriff shall forthwith deliver the deed to the appropriate officers for recording and for registry if required. Confirmation of the sale by the court shall not be required."
 
 
 19
 Significant by its absence from Rule 3135 is any requirement that the sheriff deliver the deed to the grantee. This exclusion of a delivery obligation gives rise to an inference that the omission was intentional. See 2A J. Sutherland, Statutes and Statutory Construction Sec. 47.25 (N. Singer 4th ed. 1984); Williams v. Wohlgemuth, 540 F.2d 163, 169 n. 30 (3d Cir.1976) (provision "is as significant for what it omits as for what it says"). That this omission was not in fact inadvertent is borne out by the Commonwealth's historical treatment of sheriff's sales.
 
 
 20
 In 1836 the General Assembly enacted a statute which required the sheriff to "give the buyer a deed, duly executed and acknowledged in court, for what is sold, in the manner hitherto practiced in case of the sale of lands by sheriffs upon execution." Act of June 16, 1836, ch. XV, Sec. 94, Pub.L. No. 755 (codified at Pa.Stat.Ann. tit. 12, Sec. 2531 (Purdon 1967) (repealed)). In 1898 the Pennsylvania Supreme Court held delivery of the sheriff's deed essential to pass title: "No right attaches to the purchaser until he receives his deed." Hughes v. Miller, 186 Pa. 375, 380, 40 A. 492, 493 (1898). In Hughes, the sheriff had acknowledged the deed, but the court struck the acknowledgment and directed a new sale when the purchaser refused to pay the agreed price.
 
 
 21
 The Act of April 22, 1905 modified the sheriff's sale procedure by establishing what the title of the statute termed "constructive delivery." The Act read in pertinent part:
 
 
 22
 "the prothonotary or clerk shall deliver the deed to the sheriff ..., who shall forthwith cause it to be registered in the proper office, if registry be required, and recorded in the office for the recording of deeds.... The acknowledgment of the deed, and its delivery to the sheriff ... for the purpose of recording, shall operate as a delivery to the grantee or grantees named therein, with the same effect as if acknowledged in open court, ... and as if delivered to such grantee or grantees personally."
 
 
 23
 Act of April 22, 1905, Pub.L. No. 265, Sec. 4 (codified at Pa.Stat.Ann. tit. 12, Sec. 2537 (Purdon 1967) (repealed)). Thus, the 1905 Act provided that physical delivery of the sheriff's deed to the grantee was no longer a prerequisite for the transfer of title. See Pa.Stat.Ann. tit. 12, Sec. 2550 (Purdon 1967) (enacted by Act of April 22, 1905, Sec. 2) (repealed) (sheriff's deeds "shall be effective to pass to the grantee or grantees named therein a fee simple title to the premises conveyed").
 
 
 24
 In 1960, exercising its procedural rulemaking power, the state supreme court suspended a number of statutes "insofar as they apply to the practice and procedure in enforcement of judgments." Pa.R.Civ.P. 3241 note. The 1905 "constructive delivery" statute was among the suspended provisions. The court then promulgated Pennsylvania Rule of Civil Procedure 3135, previously discussed. In commenting on the new rule, the court observed: "It is no longer necessary to have returns of execution of real estate read in open court or advertised and the sheriff may, within ten days after filing the schedule of distribution, if no petition to set aside the sale is filed, execute, acknowledge and deliver the deed to the property sold." 398 Pa. lxxi (1960).
 
 
 25
 Referring to the 1905 Act, the suspension provision states: "These Sections relate to custody of sheriff's deed pending acknowledgment and delivery, provides for county of acknowledgment and prohibits acknowledgment pending motions to set aside sale." Pa.R.Civ.P. 3241(82). No reference is made to any change in the substantive law of constructive delivery.
 
 
 26
 In 1978 the General Assembly passed the Judiciary Act Repealer Act (JARA), Pub.L. No. 202, No. 53, Sec. 1 (1978) (codified at 42 Pa.Cons.Stat.Ann. Secs. 20001-04). This statute confirmed the authority of the state supreme court to prescribe rules of practice and procedure "consistent with the Constitution of Pennsylvania", provided such rules "neither abridge, enlarge nor modify the substantive rights of any litigant." 42 Pa.Cons.Stat.Ann. Sec. 1722(a)(1).
 
 
 27
 Section 1722(b)(1) provides that rules may be given the "effect of judgments ... and other process issuing out of [ ] a tribunal." Section 20002(a) of JARA "repealed absolutely" numerous statutes including the "Act of April 22, 1905 (P.L. 265, No. 185), entitled 'An act relating to sheriff's and coroner's deeds.' " 42 Pa.Cons.Stat.Ann. Sec. 20002(a) . However, the provision continues: "The Act is hereby repealed immediately insofar as inconsistent with general rules prescribed pursuant to 42 Pa.C.S. Sec. 1722(b)." Id. (emphasis added).
 
 
 28
 Section 20003(b) explains that the specific repeals "are intended to eliminate obsolete, unnecessary or suspended statutory provisions." General rules in effect on the date of the repeal of a statute were to provide the practice and procedure with respect to enforcement of any right where the practice had previously been governed by the now-repealed statute. "If no such general rules are in effect ..., the practice and procedure provided in the repealed statute shall continue in full force and effect, as part of the common law of the Commonwealth, until such general rules are promulgated." 42 Pa.Cons.Stat.Ann. Sec. 20003(b).
 
 
 29
 We have found no authoritative appellate decision to guide us in determining whether Pennsylvania, at the times relevant here, would treat the sheriff's action as constructive delivery. However, we believe that the state supreme court would conclude that the Act of 1905--insofar as it gives substantive effect to constructive delivery--was not affected by the 1960 promulgation of Pennsylvania Rule of Civil Procedure 3135.
 
 
 30
 Whether JARA repealed the constructive delivery provision is subject to some doubt. Although JARA declares the 1905 statute repealed, the constructive delivery provisions arguably are not "obsolete, unnecessary, or suspended." Id. By its terms, JARA was designed to affect procedure and not to abrogate existing substantive law.
 
 
 31
 We are convinced also that the Act of 1836 requiring the sheriff to personally deliver the deed to the grantee was not revived. That much is established by the new procedural rule terminating the sheriff's responsibility when he turns the instrument over to the recorder of deeds.
 
 
 32
 The question then is whether constructive delivery, enforced by legislation for more than seventy-five years and which today remains consistent with the newly adopted procedural rule, is to be abrogated by implication through a statutory provision adopted primarily for procedural and housekeeping reasons. We think not. From our study of the relevant statutes, their history, the procedural rules, and the sparse case law available, we predict that the Supreme Court of Pennsylvania would hold that a sheriff's transmittal of a deed for recordation constitutes constructive delivery sufficient to pass legal title; personal delivery of the deed to the grantee is not required. Cf. Commonwealth v. Kelly, 319 Pa.Super. 204, 465 A.2d 1301 (1983) (substantive law considered to continue in effect despite JARA's repeal of pertinent statutes).
 
 B.
 
 33
 Having determined that constructive delivery survives in Pennsylvania, we consider whether Onofrio had the capacity to direct delivery to Michael. In Pennsylvania, legal title to property purchased at an execution sale is not transferred until the deed has been acknowledged and delivered to the recorder of deeds. In Pennsylvania Co. for Ins. on Lives & Granting Annuities v. Broad St. Hosp., 354 Pa. 123, 127, 47 A.2d 281, 283 (1946), the state supreme court observed that the sheriff's sale occurs when the hammer falls. At that moment, the purchaser acquires a vested equitable interest that matures into legal title upon compliance with the terms of the sale. Id.
 
 
 34
 It follows that Onofrio acquired a vested interest (but not legal title) to the property on the day of the sheriff's sale. This interest was alienable such that he could designate a grantee, and the sheriff could properly honor that direction. When the sheriff, complying with Onofrio's unambiguous instruction to list Michael as grantee, presented the deed to the recorder, legal title passed to Michael.
 
 
 35
 This result is compelling for several reasons. The 1905 constructive delivery statute identifies the legal title holder of a sheriff's deed as "the grantee or grantees named therein." Pa.Stat.Ann. tit. 12, Secs. 2537, 2550 (Purdon 1967) (repealed). No provision either expressed or implied mandates that title pass only to the purchaser at the sheriff's sale.
 
 
 36
 Moreover, the purpose served by physical delivery in an inter vivos gift context is achieved through a sheriff's sale. A physical transfer requirement ensures finality to a transaction. In the sheriff's sale setting, the purchaser who buys for the benefit of another is divested of dominion over the property at the same time as the grantee is invested with legal title--when the deed is acknowledged and delivered. Thus, the demarcation for acquisition of ownership is clearly drawn.
 
 C.
 
 37
 Concluding that there had been no delivery to Michael, the district court ended its analysis without discussing the second factor necessary to establish a gift--donative intent. The record reveals that Michael paid no consideration for the property. Consequently, he could have received title either for his own benefit, as a gift, or for Onofrio's benefit, as a agent. The ramifications of these possibilities, particularly in light of the litigation that the government has brought against the Onofrio estate and heirs, require clarification. Therefore, we will remand to the district court for further proceedings to resolve the issue of donative intent.
 
 II.
 
 38
 As an alternative ground for granting the government's motion for summary judgment, the district court determined that the May 1981 sheriff's sale had not discharged the federal tax liens attached to the property. We do not agree.
 
 
 39
 Two statutory methods may be used to divest federal tax liens. The first, 26 U.S.C. Sec. 7425, provides that in certain circumstances a tax lien may be discharged if the government is given notice not less than twenty-five days before the sale. Michael does not dispute that the notice given here was less than twenty-five days. Consequently, that statutory relief is unavailable.
 
 
 40
 Michael does argue, however, that another statute, 28 U.S.C. Sec. 2410, effected divestiture on these facts. Briefly stated, this statute permits a mortgagee seeking foreclosure on property encumbered by a federal tax lien to join the United States as a party to the proceeding. Section 2410(c) provides that "a judgment or decree in such action or suit shall have the same effect respecting the discharge of the property from the mortgage or other lien held by the United States as may be provided with respect to such matters by the local law of the place where the court is situated." Under Pennsylvania law, the lien of the United States would be discharged. See, e.g., Florida First Bon Capital Corp. v. Zoning Hearing Bd., 40 Pa. Commw. 448, 397 A.2d 838 (1979). However, section 2410(c) requires that "an action to foreclose a mortgage or other lien, naming the United States as a party under this section, must seek judicial sale."
 
 
 41
 Because the United States had been properly served in the Lehigh County foreclosure action, the district court turned to the question of whether the sheriff's sale qualified as a "judicial sale" within the meaning of section 2410(c). The district judge concluded that a judicial sale requires a court order directing the sale and a subsequent court confirmation of the sale's validity. In support of this conclusion, he cited three authorities: Yazoo & Mississippi Valley R.R. v. City of Clarksdale, 257 U.S. 10, 19, 42 S.Ct. 27, 29, 66 L.Ed. 104 (1921); A.H. & R.S. Coal Corp. v. United States, 461 F.Supp. 752, 755 (W.D.Pa.1978); In re Sale of Certain Unmined Coal (Baton Coal Co. Appeal), 365 Pa. 519, 523-25, 76 A.2d 194, 196 (1950). The court noted that in Pennsylvania execution on judgments pursuant to mortgage foreclosures are governed by Pennsylvania Rules of Civil Procedure 3180-83, which in turn incorporate Rules 3103 and 3135 governing enforcement of money judgments generally.
 
 
 42
 Rule 3103 provides for sheriff's sale in the absence of a court order; Rule 3135 provides that the sale need not receive judicial confirmation. As the district court reasoned, because both requirements for a "judicial sale" were absent, a Pennsylvania sheriff's sale on a mortgage foreclosure could not constitute a judicial sale under section 2410(c) and thus could not divest the federal tax liens.
 
 
 43
 The syllogism is unassailable. The correctness of the result, however, depends on the accuracy of the premises.
 
 
 44
 The term "judicial sale" is not defined in the statute itself, and it has been given a variety of meanings in diverse contexts. We have found no clearly governing statutory or decisional law addressing the question raised here. Some extended discussion of the issue, therefore, is necessary.
 
 
 45
 In United States v. Brosnan, 363 U.S. 237, 80 S.Ct. 1108, 4 L.Ed.2d 1192 (1960), the Supreme Court examined the effect of two disparate state proceedings which allegedly had worked to divest federal tax liens. In a California proceeding, property was sold on default of a mortgage that had granted the power of sale to a trustee. The sale was private, and the government had received no notice. Nevertheless, the Supreme Court ruled that, because under California law all junior liens were discharged, the sale divested the government's subordinate tax lien as well.
 
 
 46
 The second case before the Court grew out of an execution sale of Pennsylvania real estate following a confession of judgment on the bond accompanying a mortgage. Not until after entry of judgment had the mortgagees attempted to join the United States under section 2410, a move the district court concluded had failed to comply with the statute's requirements. Nevertheless, the court ruled that because the government's lien was junior to the mortgage, it had been divested. This court affirmed the district court, as did the Supreme Court.
 
 
 47
 Recognizing that the use of liens enmeshed federal law "into an area of complex property relationships long since settled and regulated by state law," the Supreme Court adopted state law as the rule of decision for the divestment of tax liens. Id. at 241-42, 80 S.Ct. at 1111-12. The Court wrote that, according to Pennsylvania law, "the Sheriff's sale of the mortgaged land under a writ of fieri facias was a judicial sale, having the effect of extinguishing junior liens even though their holders were not, nor required to be made, parties to the proceedings." Id. at 250, 80 S.Ct. at 1116.
 
 
 48
 The dissenting justices protested the result as detrimental to the public fisc because it permitted divestiture of a tax lien without notice to the government. The dissenters were concerned particularly with the private trustee sale in California which had "wipe[d] out the government lien without notice, hearing or redemption rights". Id. at 259, 80 S.Ct. at 1120 (Clark, J. dissenting).
 
 
 49
 As the majority indicated, the Supreme Court did not rest its Brosnan holding on any aspect of section 2410. Yet, in response to Brosnan, Congress amended both section 2410 and section 7425. To correct the problems the dissent had described, the legislation provided for notice to the government and a right of redemption.
 
 
 50
 Amended section 7425 addressed two categories of sales. Subsection (a) governed judicial sales in which the United States was not named as a party, and subsection (b) referred to sales "made pursuant to a confession of judgment" or pursuant to a nonjudicial sale under a statutory lien on such property. In the latter event, twenty-five days notice to the government is required. 26 U.S.C. Sec. 7425(c)(1). The changes to section 7425(a) thus effectively negated the Brosnan analysis on the California case, and the changes to section 7425(b) essentially abrogated the Brosnan result as to the Pennsylvania case.
 
 
 51
 The Senate Report evidences Congressional concern with the two situations in which the government, although not a party to the litigation, could nevertheless be prejudiced by the lack of actual notice of the sale. The Senate Committee on Finance commented:
 
 
 52
 "Where there is a plenary judicial proceeding and the Government, as a junior lienor, must be joined for its interests to be discharged in the proceeding, the present procedure works well.... The bill provides that in a plenary judicial proceeding where the Government has properly filed notice of a tax lien before the proceedings commence, but the Government is not joined as a party in the court proceeding, a judgment as to the property is not to disturb a tax lien.... Where the Government is joined in these proceedings no change is made by the bill in the present operation of local law."
 
 
 53
 S.Rep. No. 1708, 89th Cong., 2d Sess., reprinted in 1966 U.S.Code Cong. & Admin.News 3722, 3748-49. See also H.R.Rep. No. 1884, 89th Cong., 2d Sess., 1966-2 C.B. 832-33. In short, Congress saw no substantial problem in cases where the government had been joined as a party.
 
 
 54
 Section 2410 was amended, however, by adding the sentence: "an action to foreclose a mortgage or other lien, naming the United States ..., must seek judicial sale." Act of Nov. 2, 1966, Pub.L. No. 89-719, 80 Stat. 1125, 1147-48 (1966). An earlier version had provided that "a judicial sale made in pursuance of a judgment in such a suit shall have the same effect respecting the discharge" of liens held by the United States "as may be provided with respect to such matters" by local law. Act of March 4, 1931, Pub.L. No. 862, ch. 515, Sec. 4, 46 Stat. 1528, 1529 (1931). Both the old and new versions of section 2410(c) required "judicial sale."
 
 
 55
 The legislative history gives no indication that Congress intended the 1966 amendments to define a "judicial sale." Congress seemingly saw no need to do so despite the Court's observations in Brosnan that the sheriff's sale was a "judicial sale" under Pennsylvania law. Although Congress expressed concern about Brosnan' § allowance of tax lien divestiture without notice to the government, it evidently did not find objectionable the Court's references to "judicial sale."
 
 
 56
 The government, however, relies on cases which it contends give a narrow and specialized meaning to the term "judicial sale." The government quotes from Yazoo in which the court said: "We think that the language of this act limits its application to judicial sales made under order or decree of the court and requiring confirmation by the court for their validity." Yazoo, 257 U.S. at 19, 42 S.Ct. at 29.
 
 
 57
 Careful reading of Yazoo, however, fails to support the government's position; the quoted language is clearly limited by its context. In that case, the Court rejected a challenge to a marshal's sale of personalty asserted to be void because the transaction occurred at the federal courthouse, rather than at the state courthouse as required by local law. The federal statute to which the court referred required that "all personal property sold under any order or decree of any Court of the United States" be sold at the "county, parish, or city" courthouse. Id. at 18, 42 S.Ct. at 29. The statute did not contain the words "judicial sale," and the Court's holding applied only to an "order or decree of any Court of the United States." The Yazoo opinion nowhere purports to define or limit the term "judicial sale." At most, the case can be cited for the narrow proposition that the particular sale in that case fell within the broader category of "judicial sale."
 
 
 58
 Our reading of Yazoo is not compromised by the Court's admonition that the statute at issue would not "extend to sales under common-law executions which issue by mere praecipe of the judgment creditor on the judgment without order of the court, and in which the levy and sale of the marshal are ministerial, do not need confirmation to give them effect, and only come under judicial supervision on complaint of either party." Id. at 19, 42 S.Ct. at 29. This passage holds no more than that such sales do not fall within the statutory language of those conducted under an "order or decree of any Court of the United States."
 
 
 59
 Nor do we find persuasive guidance in United States v. Branch Coal Corp., 390 F.2d 7 (3d Cir.), cert. denied, 391 U.S. 966, 88 S.Ct. 2034, 20 L.Ed.2d 878 (1968). In that case, the district court had ordered a public sale to satisfy a default judgment in favor of the United States. The successful bidder protested that the terms of the sale were in conflict with Pennsylvania state practice governing execution sales. We pointed out in Branch Coal that, because the sale was conducted under the court's auspices, it constituted a judicial sale rather than one held under a writ of execution. Id. at 9. Our opinion did not attempt to confine the term "judicial sale" only to sales of the type described in Yazoo.
 
 
 60
 The government also cites Kasdon v. G.W. Zierden Landscaping, Inc., 541 F.Supp. 991 (D.Md.1982), aff'd sub nom Kasdon v. United States, 707 F.2d 820 (4th Cir.1983). We find that case inapposite because the sale under Maryland law was not conducted pursuant to a court proceeding and apparently occurred before the United States had been joined as a party.
 
 
 61
 The interpretation of "judicial sale" under section 2410 is a matter of federal law. See Aqua Bar & Lounge, Inc. v. United States, 539 F.2d 935, 938 (3d Cir.1976). Failing to find a definitive explanation of the term under federal law, courts have turned to other sources for enlightenment.
 
 
 62
 Judge Marsh noted in A.H. & R.S. Coal Corp. v. United States, 461 F.Supp. 752, 755 (W.D.Pa.1978), that "[w]hat may accurately be denominated as a judicial sale is not very well settled." In that case, the court distinguished a sheriff's sale of personalty from one of realty based on a mortgage foreclosure judgment. In reviewing Pennsylvania law, the court stated: "A mortgage foreclosure is a judgment against the land and it 'imposes no personal liability upon the mortgagors against whom the judgment is obtained.... The sole purpose of the judgment obtained through an action of mortgage foreclosure is to effect a judicial sale of mortgaged property. Once the foreclosure sale has taken place, the purpose of the judgment has been fulfilled and is rendered functus officio.' " Id. (citing Meco Realty Co. v. Burns, 414 Pa. 495, 498, 200 A.2d 869, 871 (1964) (emphasis in original)).
 
 
 63
 The district court in A.H. & R.S. Coal found that the sale of personalty could not be equated with a sheriff's sale of realty based on a mortgage foreclosure judgment. Because the United States was not a party to the sheriff's sale of the personalty, the court held that the tax lien remained. Significantly, the case did not involve a dispute over the efficacy of the sale of realty pursuant to a default judgment in a mortgage foreclosure action.
 
 
 64
 The inconsistency in the definitions given "judicial sale" is further demonstrated by Mitchell v. St. Maxent's Lessee, 71 U.S. (4 Wall.) 237, 242, 18 L.Ed. 326 (1866), in which the Court referred to a marshal's sale held pursuant to a writ of fieri facias as a "judicial sale." Similarly, Pennsylvania cases offer no authoritative definition of what constitutes a "judicial sale." See Quaker State Oil Refining Corp. v. Lansberry, 413 Pa. 207, 212, 196 A.2d 649, 652 (1964); Dry Dock Series Bldg. Ass'n v. Georeno, 106 Pa.Super. 505, 506-11, 163 A. 382, 382-84 (1932); City of New Castle v. Whaley's Heirs, 102 Pa.Super. 492, 499, 157 A. 503, 504-05 (1931); Sale of Certain Unmined Coal, 365 Pa. at 523-25, 76 A.2d at 196.
 
 
 65
 This elusive term assumes its coloration in each instance from the background against which it appears. Application in the context of section 2410, then, can be discerned only by examining the objective promoted in the statute and the means chosen to accomplish that end.
 
 
 66
 As the preceding discussion demonstrates, Congress wished to prevent the discharge of federal tax liens by operation of local law in circumstances where the government was not given notice or an opportunity to protect its interest. The legislation extended to cases where a mortgage granted a private right of sale and to cases where judgment was entered by confession, precluding a dispute on the merits.
 
 
 67
 The circumstances here, however, are quite different. Judgment in this case was obtained in an action for mortgage foreclosure, a plenary proceeding in the Court of Common Pleas preliminary to a sale of the specific land described in the complaint. The government, joined as a party under section 2410(a), voiced no objection to the proceeding, and consented to execution provided that the procedure terminated in a judicial sale. The government made no assertion at that time that the routine procedure of a sheriff's sale, conducted in accordance with the Pennsylvania Rules of Civil Procedure, would not qualify as a section 2410(c) judicial sale.
 
 
 68
 The government had notice of the proceeding and an opportunity to prevent the sale if there was proper cause to do so. Indeed, here the United States enjoyed even more protection. After the sale, the government received a copy of the proposed distribution of the proceeds. At that point, the United States once more had the opportunity to protest that its interest had not been properly taken into account, yet again it took no action. Only after a court order dismissed the objections filed by another junior lienor were the proceeds distributed and the case closed.
 
 
 69
 The procedures employed here fully addressed the concerns that had prompted Congress to enact the protections embodied in sections 2410 and 7425. The government had received actual, timely notice, was made a party to the plenary proceeding before judgment was entered, and afterward had the opportunity to protest the distribution of the proceeds before the proceeding became final. In light of the purposes of the statute, we therefore conclude that the sale of the liened property in the case at hand fully satisfied the requirement of a judicial sale.
 
 III.
 
 70
 In sum, we hold that the sale in this case complied with the requirements of 28 U.S.C. Sec. 2410(c). We hold also that the action of the sheriff in presenting his deed to the recorder of deeds for recordation amounted to delivery to Michael. We will remand, however, for further proceedings to determine if Michael received the property as a gift, in the capacity as a trustee, or in some other role.
 
 
 
 *
 The Honorable Maurice B. Cohill, Jr., Chief Judge, United States District Court for the Western District of Pennsylvania, sitting by designation
 
 
 [1]
 The government sought to enforce its tax liens against two distinct parcels, one on Madison Street and one on Liberty Street. This appeal, however, concerns only the Madison Street parcel
 
 
 [2]
 The deed bears the legend: "DEED POLL--Frank M. Capobianco by Joseph E. Bakes, Sheriff To Michael J. Capobianco, Allentown, Pennsylvania"
 
 
 [3]
 The Recorder of Deeds issued a notice certifying that "a Sheriff's Deed, dated, September 22, 1982 conveying certain Real Estate, as in said writ described, sold on the twenty-second day of May A.D. 1981, to Michael J. Capobianco by virtue of the above stated writ, was recorded on September 22 1982 in the office for the Recording of Deeds in and for said County of Lehigh, in Deed Book, Volume 1310, Page 790."