[Cite as *Ag Choice Farm Credit, ACA v. Zylstra Dairy, Ltd.*, 2020-Ohio-1313.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## PAULDING COUNTY

AG CHOICE FARM CREDIT, ACA,

    PLAINTIFF-APPELLEE,                    CASE NO. 11-19-08

    v.

ZYLSTRA DAIRY LTD., ET AL.,

    DEFENDANTS-APPELLEES,
    -and-                                  O P I N I O N

UNITED STATES OF AMERICA,

    DEFENDANT-APPELLANT.

---

Appeal from Paulding County Common Pleas Court
Trial Court No. CI 16 173

Judgment Affirmed

Date of Decision: April 6, 2020

---

APPEARANCES:

    *Guillermo J. Rojas* and *Robert J. Branman* for Appellant

    *Benjamin Z. Heywood* and *Meghan A. Roth* for Appellee,
        Ag Choice   Farm Credit, ACA

**SHAW. P.J.**

{¶1} Defendant-appellant, the United States of America (the "United States"), appeals the August 27, 2019 judgment of the Paulding County Court of Common Pleas terminating the receivership established at the request of plaintiff-appellee, Ag Choice Farm Credit, ACA ("Ag Choice"), over defendant-appellee Zylstra Dairy, Ltd., ("Zylstra"). On appeal, the United States argues that the trial court erred in terminating the receivership without addressing its claims to the milk proceeds collected by the dairy under the receivership.

*Background*

{¶2} Ag Choice and Zylstra established their business relationship in 2004 when Ag Choice began financing Zylstra's operations. Zylstra owned and operated a dairy farm on real property that consisted of 127 acres of land and improvements, including barns housing a 1,250 stall dairy, a modern milking parlor, and manure storage facilities. Zylstra also owned a herd of approximately 1,000 cows, various vehicles, farm equipment, and milk inventory.

{¶3} On March 14, 2013, Ag Choice loaned Zylstra a principal amount of $2,800,000, and on January 20, 2016, Ag Choice loaned Zylstra a principal amount of $954,131.35. The loans were secured by an open-ended mortgage recorded on March 14, 2013 in the Paulding County Recorder's Office, and security agreements dated January 21, 2014 and August 21, 2014. The security agreements gave Ag

Choice a security interest in substantially all of Zylstra's personal property, including inventory, equipment, accounts, farm products (specifically including livestock), and association equity. Ag Choice perfected its security interest by filing a UCC-1 financing statement.

{¶4} The obligations of Zylstra to Ag Choice were further secured by proceeds of milk and dairy products marketed by Dairy Farmers of America ("DFA") for Zylstra by an assignment of account effective in April 2016 that required DFA to pay Ag Choice $44,940 a month from those proceeds ("Milk Assignment").[1]

*Procedural History*

{¶5} On November 21, 2016, Ag Choice filed a "Verified Complaint for Breach of Promissory Notes, Enforcement of Security Agreements, for Foreclosure of Mortgage, and for the Appointment of Receiver." Ag Choice named Zylstra, the United States, and several other interested parties, mostly creditors, as defendants. Ag Choice alleged that Zylstra was insolvent and sought to foreclose on the mortgage and to enforce the security agreements. Ag Choice requested the appointment of a receiver in order to protect its collateral in the dairy operation. Ag

---

[1] The record reflects that the Milk Assignment between Ag Choice and Zylstra was initially effective in September 2009 and required DFA to pay Ag Choice a monthly amount of $63,759 of Zylstra's milk proceeds. In April 2016, Ag Choice reduced the monthly assignment amount because Zylstra needed more income to maintain the herd.

Choice further sought a judgment against Zylstra in the amount of $3,376,742.29, plus interest, fees, and expenses. The trial court appointed a receiver the next day.

{¶6} The United States filed an answer to the complaint, asserting a cross-claim for funds to satisfy its tax liens against Zylstra arising from unpaid employment taxes for the periods of December 31, 2013 through December 31, 2016.[2] Specifically, the United States argued that it had perfected its liens upon filing them on July 13, 2015, July 20, 2015, and June 6, 2016, and therefore claimed to have priority with respect to any property owned by Zylstra that came into existence 45 days after it filed notice of its liens. *See* 26 U.S.C. § 6323(d).

{¶7} In March and April of 2017, pursuant to a court-approved asset purchase agreement, the receiver sold real property and personal property, excluding the herd of cattle, belonging to Zylstra for $2.3 million. The net proceeds from this sale totaled $2,276,084.18. The herd consisting of 778 cattle were sold at $1,100 a head for a gross total of $855,800. The receiver also sold miscellaneous equipment belonging to Zylstra at auction for $62,475, leaving a net total of $50,903.79 after expenses. The amount of proceeds from the sale of *all* Zylstra's assets sold by the receiver totaled $3,182,787.97.

{¶8} On April 28, 2017, the trial court issued an order directing the parties to file briefs asserting their priority positions regarding their claims to the proceeds

---

[2] United States filed a "Proof of Claim for Internal Revenue Taxes," establishing that Zylstra owed $318,231.25 in unpaid taxes, penalties, and interest.

of the sales held in the receivership account.[3]  In their respective briefs, Ag Choice maintained that it had senior priority position as to *all* of the receivership assets based upon its mortgages, security interests, and Milk Assignment.  The United States claimed that it had priority over Ag Choice with respect to the sale proceeds from 17 cows, or $18,700.

{¶9} On October 25, 2017, the trial court issued a judgment entry finding that Ag Choice was entitled to senior lien priority status over the United States with respect to the 17 cows.  Specifically, the trial court determined that Ag Choice's liens were superior to that of *all* the named creditors, including the United States. The trial court further found that Ag Choice was entitled to all remaining proceeds after the payment of the receiver's administrative costs.

{¶10} On November 22, 2017, the United States filed a notice of appeal to this Court, appealing the trial court's October 25, 2017 lien priority determination. *See Ag Choice Farm Credit, ACA v. Zylstra Dairy Ltd., et al.*, 3d Dist. Paulding No. 11-17-09.

{¶11} On January 16, 2018, while the appeal was pending, the receiver filed an interim report informing the trial court that it had disbursed $2,939,000 to Ag

---

[3] As far as the other creditors asserting claims to the proceeds, an individual named Larry Baker claimed he was entitled to $31,900 attributable to the sale proceeds of 29 cows, and the State of Ohio claimed to be entitled to $73,208.38 for delinquent taxes and Worker's Compensation premiums.  However, since these parties did not participate in this appeal, we will not further discuss their specific claims.

Choice and further indicated that he was holding $190,477.27 in the receivership account to pay final receivership bills.

{¶12} On January 18, 2018, the United States filed a "Motion for Determination that the Federal Tax Liens are a Senior Lien Against the Remaining Receivership Funds (Net of Remaining Administration Expenses) and to Reconsider 10/25/17 Ruling As to 17 Cows." For the first time during the trial court proceedings, the United States argued that its tax liens were entitled to priority with respect to the milk proceeds collected during the receivership, which it claimed represented the majority of the $190,477.27 remaining in the receivership account. The United States also requested the trial court reconsider its lien priority determination with respect to the $18,700 in proceeds from the sale of 17 cows. At the same time, the United States sought to dismiss its pending appeal without prejudice, arguing to this Court that the trial court's October 25, 2017 Judgment Entry was not a final, appealable order.

{¶13} In response, Ag Choice sought to strike the United States' motion, asserting that the trial court had already "decided the seniority of Ag Choice's security interest as to all of the receivership assets. Those assets include the funds still held by the receiver, which were held back to pay administrative expenses and wind up the receivership. Once that is completed, the Receiver will distribute the funds to Ag Choice according to the [October 25, 2017] order. There is nothing

more of substance for this Court to do." (Doc. No. 88 at 1-2). Ag Choice further argued that the United States' motion was an improper motion for reconsideration of a final judgment.

{¶14} In February 2018, this Court denied the United States' motion to voluntarily dismiss its appeal without prejudice finding the United States' argument that the trial court's October 25, 2017 Judgment Entry was not a final, appealable order to be without merit. Specifically, this Court determined that the trial court's judgment entry determining the lien priority of the parties constituted a final, appealable order. *Ag Choice Farm Credit, ACA v. Zylstra Dairy Ltd., et al.*, 3d Dist. Paulding No. 11-17-09. Subsequently, pursuant to the United States' motion to dismiss its appeal from the trial court's October 25, 2017 Judgment Entry with prejudice, this Court dismissed the appeal.

{¶15} On February 13, 2018, the United States filed an "Amended Motion for Determination that the Federal Tax Liens are a Senior Lien Against the Remaining Receivership Funds (Net of Remaining Administration Expenses)." In this motion, the United States expressly "removed any request to reconsider" its lien priority with respect to the proceeds from the sale of 17 cows, but reiterated its position regarding the $190,477.27 held in the receivership account based upon its claim to the milk proceeds. (Doc. No. 89 at 2).

{¶16} On March 19, 2019, the trial court issued a judgment entry overruling the United States' motion. Specifically, the trial court determined that:

> **Reviewing the October 25, 2017 Judgment Entry, in said order, the Court indicated that the liens of Ag Choice Farm Credit are superior to that of all other parties, including the United States. The Court finds that there has been no evidence presented, except an assumption by the United States, that the money currently being held by the receiver is new income not addressed by the October 25, 2017 order. The Court therefore finds that the money remaining in the receiver's hands has already been accounted for in the October 25, 2017 Judgment Entry to Ag Choice Farm Credit.**

(Doc. No. 103 at 3).

{¶17} The trial court also ordered the receiver to wind up the receivership, file a final accounting, and terminated the receivership "upon completion of any and all documentation required by law." (Id.). The trial court further ordered that "[a]ny and all additional funds remaining in the Receiver's hands after the payment of administrative expenses shall be paid to the Plaintiff Ag Choice Farm Credit as indicated in the October 25, 2017 Judgment Entry." (Id.).

{¶18} The United States appealed the trial court's March 19, 2019 Judgment Entry, however, this Court dismissed the appeal finding that the judgment was not a final, appealable order because the language contained in the judgment entry left the termination of the receivership conditioned upon a future event. *Ag Choice Farm Credit, ACA v. Zylstra Dairy Ltd., et al.*, 3d Dist. Paulding No. 11-19-03.

{¶19} On August 27, 2019, the trial court issued a judgment entry terminating the receivership.

{¶20} It is from this judgment entry that the United States appeals, asserting the following assignment of error.

**THE COURT OF COMMON PLEAS ERRED WHEN IT ORDERED DISTRIBUTION OF THE RECEIVERSHIP NET INCOME TO AG CHOICE WITHOUT ADDRESSING THE UNITED STATES' CONTENTION REGARDING THE MILK SALE PROCEEDS.**

{¶21} In its sole assignment of error, the United States argues that the trial court erred when it overruled its "Amended Motion for Determination that the Federal Tax Liens are a Senior Lien Against the Remaining Receivership Funds (Net of Remaining Administration Expenses)." Specifically, the United States argues that the trial court erred in failing to determine the lien priority with respect to the milk proceeds received as income under the receivership.

*The Parties' Positions on Appeal*

{¶22} On appeal, the United States devotes a considerable amount of its brief attempting to establish that its tax liens are entitled to priority over Ag Choice's security interests by virtue of 26 U.S.C. § 6323(d), which if applicable would deem the federal tax liens senior with respect to any property acquired by Zylstra more

than 45 days after the first tax lien was recorded.[4] The United States argues that the trial court's October 25, 2017 Judgment Entry only determined the parties' lien priority with respect to the sale proceeds from Zylstra's real estate, personal property, equipment, and the herd. Therefore, United States contends that the trial court has yet to adjudicate the parties' lien priority with respect to the milk proceeds.

{¶23} On appeal, the United States further asserts that it is not only entitled to priority over Ag Choice regarding the net proceeds from the $190,477.27 reserved by the receiver, but it also alleges wrongdoing on the part of receiver for using the $1,153,357.11 in milk proceeds to operate the dairy while under receivership. As such, the United States further seeks an order directing Ag Choice to "disgorge" the distributions attributable to the milk proceeds, which it now contends is the "government's collateral." (Appt. Br. at 23).

{¶24} In response to the United States' position that its tax liens are senior to its security interests, Ag Choice argues that the milk proceeds are "qualified property" under 26 U.S.C. § 6323(c)(2), which provides an exception to the general rule and gives priority for certain security interests arising within 45 days after tax lien filing. More importantly, Ag Choice maintains that the United States had the opportunity to argue its theory of senior lien priority regarding the milk proceeds

---

[4] As previously indicated, the United States filed its tax liens on July 13, 2015, July 20, 2015, and June 6, 2016. The milk proceeds were collected during the receivership from November 25, 2016 through May 16, 2017.

prior the trial court's final determination on the matter in its October 25, 2017 Judgment Entry, and even in its original appeal of that judgment to this Court, but failed to do so, and is now precluded from arguing its entitlement to any of the milk proceeds under the law of the case doctrine.

{¶25} Specifically, Ag Choice contends that when the receiver sold the real estate, personal property, equipment, and the herd for $3,182,787.97 pursuant to the court-approved sale, this amount represented the total proceeds available from the sale of *all* of Zylstra's assets under the receivership. Ag Choice maintains that throughout the case the parties were aware that the receiver used the income from the milk proceeds to continue the dairy's operation under receivership. Thus, the milk proceeds were reinvested into the real estate, personal property, and the herd, and did not constitute a separate asset at the time of the court-approved sale. Ag Choice argues that when the trial court determined the issue of lien priority based on the parties' claims, the milk proceeds were included in the assets, albeit in a different form. Therefore, Ag Choice asserts that the parties' lien priority regarding *all* the receivership assets had already been determined by the trial court in its October 25, 2017 Judgment Entry.

*Discussion*

{¶26} The record reflects that in its Verified Complaint initiating this case, Ag Choice addressed the issue of milk proceeds by discussing the "Milk

Assignment" executed in April of 2016 and the accompanying UCC-1 financing statement perfecting its security interest in Zylstra's milk proceeds. These documents were attached as exhibits to the complaint and established an "irrevocable" assignment to Ag Choice of the milk proceeds due to Zylstra from Dairy Farmers of America, Inc. ("DFA"), the third party who marketed Zylstra's dairy products. (Doc. No. 1, Ex. G).

{¶27} In its June 14, 2017 brief to the trial court asserting its priority position to the asset sale proceeds, Ag Choice discussed the Milk Assignment in further detail. Ag Choice explained that the Milk Assignment originated in 2009 and required DFA to pay Ag Choice $63,759 a month from Zylstra's milk and dairy proceeds marketed by DFA. In April of 2016, Ag Choice amended the Milk Assignment, reducing the monthly amount it received to $44,940, so that Zylstra could use the funds to provide care and maintenance for the herd and to replace livestock as needed. Ag Choice stated that it had not received any of the proceeds from the Milk Assignment since August 2016 when Zylstra filed for bankruptcy prior to being placed under receivership in the instant case.[5]

{¶28} In addition to reducing the amount collected under the Milk Assignment, Ag Choice stated that it also advanced $228,979.06 to fund the diary operations throughout Zylstra's bankruptcy and the receivership proceedings. Ag

---

[5] The record reflects that Zylstra filed for a petition for Chapter 7 Bankruptcy in August of 2016, which was subsequently dismissed by the Bankruptcy Trustee prior to the initiation of this case by Ag Choice.

Choice asserted in its brief that the "Receiver collected and used $1,153,357.11 of Ag Choice's assigned milk money from DFA." (Doc. No. 56 at 3). Moreover, Ag Choice even attached as an exhibit to its brief an accounting reflecting that DFA had distributed $1,153,357.11 in milk proceeds to the receiver from November 25, 2016 through May 16, 2017, and the affidavit of Donald Herring, a Senior Credit Lender for Ag Choice, who confirmed that $1,153,357.11 in milk proceeds subject to Ag Choice's Milk Assignment had been used by the receiver to fund the dairy operations. (Doc. No. 56; Doc. No. 57, Ex. F).

{¶29} The United States was given an opportunity to reply to Ag Choice's brief asserting its claims to the milk proceeds pursuant to the Milk Assignment. In its reply, the United States only argued its lien priority with respect to its claims for proceeds from the sale of 17 cows from the herd, and even discussed Ag Choice's claims to the $1,153,357.11 representing the income from the milk proceeds under the receivership. Notably, while a number of arguments were raised as to why Ag Choice was not entitled to all of these proceeds, the United States did not assert any specific claim to the milk proceeds in its reply.

{¶30} Moreover, the parties' briefs all appear to accept the fact that the real estate, personal property, equipment, and the herd were the only assets of the receivership at the time of the court-approved sale. The record further indicates that

the parties participated in a hearing held on the issue of lien priority on October 2, 2017, although no transcript of that proceeding was filed with the record on appeal.

{¶31} In sum, through a somewhat circuitous argument on appeal, the United States appears to assert a lack of apprisal of the milk proceeds collected and used by the receiver to fund the operations of the diary under the receivership. The United States argues that the trial court's April 28, 2017 briefing order only directed the parties to state their lien priority claims regarding the real estate, personal property, and the herd. The United States maintains that it only asserted its claim to the proceeds from the 17 cows in the herd in compliance with the trial court's directives.

{¶32} At the outset, we find the United States' purported lack of awareness of the milk proceeds collected and used by the receiver is belied by the fact that this is a lawsuit involving a receivership of a dairy. Thus, it is not surprising that the milk proceeds were a primary source of income under the receivership and that the order appointing the receiver permitted this income to be used to continue the dairy operation and preserve the receivership assets. In addition, as noted earlier, this order was in response to the specific allegations, documentation, and requests of Ag Choice in its Verified Complaint for receivership and brief in support thereof. Thus, the record indicates that Ag Choice sufficiently apprised all creditor-defendants in the case, as to its claims to the milk proceeds under the "Milk Assignment," both in

its Verified Complaint, and again in its brief to the trial court in support of its priority position.

{¶33} Furthermore, the United States has failed to direct us to any portion of the record that establishes anything other than an understanding by the parties that the sale of the real estate, personal property, equipment, and the herd represented the liquidation of *all* the receivership assets. As a result, the record demonstrates that the United States was given ample opportunity to advance its claims regarding the milk proceeds prior to the trial court issuing its October 25, 2017 judgment on the parties' lien priority positions.

{¶34} In addition, we note that the United States made all of these arguments in the trial court prior to filing its motion to dismiss its pending appeal of the October 25, 2017 judgment of the trial court in this Court. The record indicates that there was nothing precluding the United States from raising these same arguments to this Court in that appeal once it was determined by this Court that the October 25, 2017 judgment was a final, appealable order. Instead, the United States chose to seek dismissal of the appeal with prejudice, thereby foreclosing any review of the October 25, 2017 judgment on the trial court's lien priority determination, or failure to address the same, as now argued by the United States.

{¶35} The law of the case doctrine provides that the " 'decision of a reviewing court in a case remains the law of that case on the legal questions involved

for all subsequent proceedings in the case at both the trial and reviewing levels.' " *Hubbard ex rel. Creed v. Sauline*, 74 Ohio St.3d 402, 404 (1996), quoting *Nolan v. Nolan*, 11 Ohio St.3d 1, 3 (1984). The doctrine "precludes a litigant from attempting to rely on arguments at a retrial which were fully pursued, or available to be pursued, in a first appeal. New arguments are subject to issue preclusion, and are barred." *Sauline* at 404-405. Accordingly, in this respect we do not find that the trial court erred in treating the United States' motion regarding the milk proceeds as an improper motion for reconsideration of its October 25, 2017 judgment.

*Waiver of Sovereign Immunity*

{¶36} The United States next claims on appeal that the trial court's October 25, 2017 judgment could not have adjudicated the issue of the parties' priority to the milk proceeds because the United States did not waive its sovereign immunity to litigate its claim on that issue. Stated differently, the United States now asserts that it only waived its sovereign immunity—i.e. consented to be a party to this lawsuit—with respect to its priority claims involving the real estate, personal property, and the herd, and that it did not waive its sovereign immunity with respect to the milk proceeds until it filed its motion asserting its priority to the milk proceeds in January of 2018. Thus, the United States maintains that the trial court did not have jurisdiction to adjudicate the issue until it made its claim at that time.

{¶37} "The basic rule of federal sovereign immunity is that the United States cannot be sued at all without the consent of Congress." *Block v. North Dakota ex rel. Bd. of Univ. and School Lands*, 461 U.S. 273, 287 (1983). "A waiver of the Federal Government's sovereign immunity must be unequivocally expressed in the statutory text and will not be implied." *Lane v. Pena*, 518 U.S. 187, 192 (1996).

{¶38} Here, 28 U.S.C. § 2410 allows for a waiver of the government's sovereign immunity in this instance and states that, "the United States may be named as a party in any civil action or suit in any district court ... to foreclose a mortgage or other lien upon … real or personal property on which the United States has or claims a mortgage or other lien." 28 U.S.C. § 2410(a)(1). This statute further provides that "an action to foreclose a mortgage or other lien, naming the United States as a party under this section, must seek judicial sale." 28 U.S.C. § 2410(c).

{¶39} The United States contends that because the court-approved sale by the receiver only included the real estate, personal property, and herd, the milk proceeds were not subject to a "judicial sale" and the statutory waiver did not apply. As we have already discussed, the record simply does not support the United States' position in this regard. Rather, the record demonstrates that *all* of the assets under the receivership were sold pursuant to the court-approved sale and that the milk proceeds were not a separate asset subject to the sale because they had been reinvested into the assets, which were ultimately judicially sold. The authority cited

by the United States is premised upon cases involving a separate cross-claim asserted by a party or property not subject to the underlying lawsuit. Neither scenario is present here, therefore, we do not find those cases dispositive of the milk proceeds issue at hand.

{¶40} In sum, by limiting the circumstances in which the United States waives sovereign immunity, "Congress wished to prevent the discharge of federal tax liens by operation of local law in circumstances where the government was not given notice or an opportunity to protect its interest." *United States v. Capobianco*, 836 F.2d 808, 817 (3d Cir. 1988). Accordingly, this waiver of immunity does not extend to claims beyond the property in controversy. *See Miller v. Tony and Susan Alamo Found.*, 134 F.3d 910, 916 (8th Cir.1998).

*Conclusion*

{¶41} In the case *sub judice*, the record demonstrates that the milk proceeds were an integral part of the property in controversy. Moreover, the record establishes that the United States was sufficiently apprised of this fact and Ag Choice's claim to and intended reinvestment of the milk proceeds into the subject property from the inception of this case. Finally, the United States was given ample opportunity to make a specific claim to the milk proceeds prior the trial court's lien priority determination. Sovereign Immunity is not intended to protect a party's failure to litigate claims and defenses available to it at the time of adjudication, even

the United States. Accordingly, we conclude that the trial court did not err in overruling the United States' untimely motion to determine lien priority with respect to the milk proceeds when it had already issued a final, appealable order adjudicating lien priority regarding all of the receivership assets.

{¶42} For all these reasons, the assignment of error is overruled and the judgment of the trial court is affirmed.

**_Judgment Affirmed_**

**PRESTON and WILLAMOWSKI, J.J., concur.**

**/jlr**